Filed 6/2/25; certified for publication 6/24/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOANNE ALLISON et al.,<br>    Plaintiffs and Appellants,<br>    v.<br>DIGNITY HEALTH,<br>    Defendant and Respondent. | A169225<br><br>(City and County of San Francisco<br>Super. Ct. No. CGC18566922) |

Plaintiffs Joanne Allison and Regina Blissett-Grohman, on behalf of themselves and others similarly situated, appeal an order decertifying their purported class claims.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Allison, a former registered nurse (RN), brought the underlying class action against her former employer, Dignity Health (Dignity), alleging claims for unpaid work, meal period and rest break violations, as well as derivative claims.  We discuss only the meal period and rest break claims relevant to this appeal.

**A. Allison's Motion for Class Certification**

Allison filed a motion for class certification on behalf of RNs who worked at three Dignity's hospitals — St. John's Regional Medical Center in Oxnard, CA (St. John's Oxnard), St. John's Pleasant Valley Hospital in

1

Camarillo, CA (St. John's Camarillo), and Mercy General Hospital in Sacramento (Mercy General) — since June 1, 2014. She also sought certification of subclasses for certain claims, including meal period violations and rest break violations.

Allison asserted that a "facial review of RN timecards" showed most RNs experienced meal periods that failed to comply with law.[1] Her expert identified all work shifts eligible for one or more meal periods and then "identified each instance where the time records reflected a Sample Class Member's meal period was either missed, late, or short/interrupted." After "accounting for premiums paid" based on Dignity's payroll data, the expert opined that over 70 percent of relevant shifts had a noncompliant meal period with an unpaid premium. Allison averred that this evidence established a rebuttable presumption of class-wide liability under *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58 (*Donohue*).[2] Moreover, because Dignity admitted it did not record the reason for any given non-compliant meal period — instead it required class members to self-report and to apply for a

_____

[1] California law "obligates employers to afford their nonexempt employees meal periods and rest periods during the workday." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1018 (*Brinker*).) When an employee works "for five hours," an employer must either: "(1) afford an off-duty meal period; (2) consent to a mutually agreed-upon waiver if one hour or less will end the shift; or (3) obtain written agreement to an on-duty meal period if circumstances permit." (*Id.* at p. 1039.) Failure to provide a compliant meal period, in the absence of a waiver, "will render the employer liable for premium pay." (*Ibid.*) A second meal period is also required for nonexempt employees who work "more than 10 hours of work in a day, absent waiver." (*Id.* at p. 1042.)

[2] *Donohue* confronted and rejected an employer's practice of rounding time punches in the meal period context because "the meal period provisions are designed to prevent even minor infractions." (*Donohue*, *supra*, 11 Cal.5th at p. 61.) It also held that "time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations." (*Ibid.*)

premium payment — Allison contended the lawfulness of placing the burden on employees to keep meal break records was a common question.

Allison based her noncompliant rest break claim (and, to some extent, her meal period claim) on purported interruptions from work-issued communication devices — i.e., Vocera devices and Spectralink devices. She asserted "Dignity's policy required RNs to wear these devices at all times . . . even during breaks," giving rise to a common question whether this resulted in unlawful off-the-clock interruptions. As common proof to establish Dignity's class-wide liability under this theory, Allison's expert opined that a "comparison of Vocera log ins with RN timecards show[ed] nearly 70% of employees in the Vocera sample were using the device while clocked-out in [Dignity's] timekeeping program."

### B. Dignity's Opposition to the Class Certification Motion

In opposing certification, Dignity argued individual inquiries predominated the meal period claim despite Allison's use of Dignity's time-clock records as class-wide proof. Dignity conceded that such records " 'raise[d] a rebuttable presumption of meal period violations at summary judgment,' " but it argued "employers must have a chance to 'rebut the presumption by presenting evidence.' " Dignity contended its "affirmative defenses" to rebut "each RN who claims they were not provided proper meal periods" would require cross-examinations and therefore would be unmanageable on a class-wide basis. Dignity also contended there was no legal support for Allison's position that an employer could not lawfully require employees to self-report and request premiums for noncompliant breaks.

Dignity asserted that Allison's rest break claim was "based on misrepresentations of both law and fact." Relying on an Opinion Letter from

3

the California Division of Labor Standards Enforcement (DLSE), Dignity argued it was lawful for health care workers to be "required to monitor phones during their meal and rest periods, and premiums are owed only if the employee must actually respond to a call." Dignity therefore maintained that liability could not be premised on RNs merely carrying Vocera or Spectralink devices.

Dignity further argued that Allison could not establish class-wide liability for the interruption-based claim by comparing time-clock records and call logs. Most obviously, "Spectralink reports cannot be linked to particular RNs," so no call logs existed for class members at St. John's Camarillo. But also, Allison's expert analysis revealed that "12.6% of alleged off-the-clock Vocera calls occurred on days when RNs were not clocked in for work," undermining any reliance on Vocera records for RNs working at the other two hospitals. Moreover, Dignity asserted that using Vocera records as class-wide evidence would be impractical because "[i]t took approximately 35 hours to produce reports for . . . 81 individuals" at just one hospital. And Dignity contended the "claims turn entirely on individualized issues," such as whether any given class member disregarded Dignity policy and failed to "hand off or turn off their hospital-issued phones while on breaks."

Dignity further argued that certification was improper because significant irreconcilable conflicts permeated the proposed class. Specifically, it contended " 'antagonistic' interests among class members" existed because some RNs were "responsible for providing breaks to others" and therefore class members "will be forced to accuse each other of failing to provide proper breaks."

### C. Allison's Reply in Support of the Class Certification Motion

In reply, Allison submitted her expert's supplemental declaration, which "excluded all shifts where Vocera . . . activity occurred, but no time punch existed." After this adjustment, her expert still found "13% of shifts in the sample had at least one Vocera entry in the data at the time the employee was clocked-out in the timekeeping program."

Allison also countered that Dignity did not have a due process right to rebut the *Donohue* presumption as to each individual class member. She contended that the DLSE Opinion letter Dignity relied on was "not binding authority" regarding the lawfulness of interruptible breaks.

She denied that a conflict of interest existed among class members because "all RNs [were] non-exempt employees, who [were] subject to Dignity's break policies, but [were] not responsible for adopting and promulgating them."

### D. The Trial Court's Initial Class Certification Order

The trial court, Judge Richard B. Ulmer Jr., granted in part and denied in part Allison's motion for class certification during a class period of June 1, 2014 to January 13, 2022.[3]

The trial court stated that Allison's meal period theory "turn[ed] on the legality of [Dignity's] 'premium request requirement,' which [was] a common question suitable for class treatment." The court accepted the proffered expert analysis as a basis for the *Donohue* presumption, finding "[t]here [was] substantial evidence from the statistics that meal breaks were frequently

---

[3] The court certified the aforementioned claims as well as other claims not relevant here, but it denied certification of a "reporting time subclass" because it was not pleaded in the complaint. The court certified Allison's derivative claims because it certified her other primary claims.

missed, late or short." The court implied that Dignity could offer individualized rebuttal, yet it found this would be manageable.

The trial court further ruled that Allison "raise[d] a legal question as to whether Dignity RNs were afforded proper meal and rest breaks if they could be interrupted." The court found the expert analysis of Vocera call logs constituted common proof of break interruptions; it did not address the fact that RNs do not log in to Spectralink devices. The court further explained that Dignity's showing that RNs "sometimes were able to take uninterrupted breaks" was insufficient to defeat the predominance of common issues.

Having addressed predominance, the court then confronted the other issues Dignity raised. In determining the class action was manageable the court stated, "individual issues that [were] likely to arise" would be manageable through the use of common proof — i.e., "Dignity's time records, audit trail reports, Vocera and Spectralink records, Cerner records, payroll records and the expert testimony based thereon." The court rejected Dignity's assertion of an intra-class conflict, explaining that, while "many RNs" performed the duties of a charge nurse, Allison's claim was that Dignity had "uniform policies and practices, promulgated at the corporate level and applied to RNs generally."

### E. Dignity's Decertification Motion

Nineteen months after the initial certification order,[4] Dignity moved to decertify the class on grounds that post-certification discovery refuted the trial court's prior predominance findings. Dignity acknowledged it bore "the nominal burden of establishing why certification is no longer warranted" and

---

[4] After the certification order, the trial court granted Allison's motion for leave to amend her complaint, joining appellant Regina Blissett-Grohman as an additional plaintiff and class representative. Accordingly, we refer to "plaintiffs" where appropriate.

6

ostensibly justified its decertification motion (the motion) on deposition testimony from class members. Dignity also observed that Allison had updated her trial plan since the certification order, in which she represented she would need to call an additional 20 to 30 witnesses and conduct a survey, "but she did not provide any information about the survey."

Pointing to class members' conflicting deposition testimony, Dignity argued "class member testimony show[ed] wide variation of relevant experiences" regarding meal period compliance and premium requests. For example, one RN testified that she "sometimes *chose* not to request premiums"; another testified he may have clocked in early from lunch on occasion because he "lost track of time"; and another RN stated she did not take a meal period on days when she wanted to go home sooner. In sum, Dignity argued "[*n*]*early all* of [the deponents] agreed their records were not entirely reliable indicators of when breaks were missed, late, or short because they sometimes *chose* to skip, shorten, or delay a meal period, or because they simply made mistakes." Dignity therefore averred that its "affirmative defenses" to rebut the liability presumed under *Donohue* — i.e., RNs' choice to waive their valid meal periods — would require "person-by-person inquiries." Accordingly, Dignity reiterated its earlier contention that its rebuttal of class-wide liability would be dominated by individualized inquiries.

Dignity further argued the post-certification evidence revealed that "cross-comparing timeclock records with Vocera/Spectralink call logs" could not prove the rest break claim on a class basis. To start, Dignity reasserted that the theory failed for any class member who worked at St. John's Camarillo because "Spectralink records [could not] be linked to a particular nurse," and it failed for RNs who worked at Mercy General or St. John's

Oxnard because "RNs routinely handed off their [Vocera] phones to covering nurses when taking breaks *without* logging out." Dignity further asserted, "the post-certification depositions show[ed] [Dignity] had no uniform practice of requiring RNs to carry or use a work phone while on a meal or rest period." For example, Dignity pointed to an RN who testified it was a "personal choice" to carry a Vocera phone during breaks; another stated "she always handed her Vocera to the break nurse when she took meal and rest periods"; while another RN testified that he adopted a practice of handing off his (still logged-in) device to a break nurse only after his department implemented break nurses *during* the class period.

Finally, Dignity renewed its contention that irreconcilable conflicts permeated the class. Beyond its original observation that Allison acted as a charge nurse responsible for supervising other RNs' meal periods and rest breaks, Dignity stated that "numerous class members testified they interrupted their fellow class members during a meal or rest period." Dignity therefore posited, "[p]laintiffs will necessarily have to call class members to testify who will accuse each other of committing the very violations that are at the heart of this lawsuit."

### F. Plaintiffs' Opposition to the Decertification Motion

In opposition to the motion, plaintiffs argued Dignity failed to satisfy its threshold burden to show "new law or new evidence showing changed circumstances" since the certification order. "[S]ave for a larger pool of witnesses" and "save for relying on two additional [DLSE] Opinion Letters," plaintiffs characterized the motion as "rehashing of the arguments and evidence the Court rejected in certifying Plaintiff's class."

Plaintiffs also countered that the post-certification evidence further demonstrated the propriety of class treatment. Specifically, plaintiffs, for the

8

first time, submitted a "survey administered to a half of the class (1,500 RNs), in which over 14.5% of employees participated" (the Steiner survey).[5]

According to their expert, Laura Steiner, "[t]he survey revealed that: (i) 97% of RNs who experienced missed/short meal breaks did so due to work reasons; (ii) 75% of RNs were interrupted with work during meal breaks and 72% during rest breaks, and of those, 87% were interrupted with Vocera calls; (iii) 79% of RNs did not request a premium for short meal breaks, and 83% did not request it for interrupted meal breaks, with 69% of RNs only requesting premiums for missed meal breaks, if at all; (v) 88% of RNs experienced missed rest breaks; (vi) 72% experienced interrupted rest breaks, where 84% of these interruptions were by Vocera calls . . . ."

Plaintiffs stated that RNs' testimony exposed that Dignity "only advised RNs to request premiums" for meal breaks they "completely missed" but not for interrupted ones. In their view, such testimony also revealed "it was not the general practice before 2019" for RNs to turn over Vocera devices to break nurses, and therefore Vocera records were reliable for discerning interrupted breaks "at least before 2019." And plaintiffs contended Dignity was incapable of rebutting the *Donohue* presumption because its post-certification discovery did not include a survey, "representative testimony," or other statistical analysis.

Regarding Dignity's intra-class conflict argument, plaintiffs argued that "Dignity should not be allowed to have another bite at an apple when presenting the same argument and evidence."

---

[5] Relatedly, plaintiffs criticized Dignity's reliance on deposition testimony because "less than 25% of the deponents were former employees," whereas over 48 percent of the class members are former employees. In contrast, the survey more closely reflected the class's proportion of former and current employees.

## G. Dignity's Reply In Support of Decertification Motion

In reply, Dignity again called its own burden "nominal," arguing post-certification deposition testimony constituted "newly discovered evidence." It averred such evidence was "substantial," "refut[ed] Plaintiffs' pre-certification representations to the Court," and therefore reflected changed circumstances.

Dignity also asked the trial court to "reject" the "deeply flawed" Steiner survey. Dignity submitted a declaration by its own expert, Stefan Boedeker, criticizing the survey's methodology on multiple grounds.

## H. The Trial Court's Decertification Order

Following a hearing, the trial court, Judge Curtis E. A. Karnow, granted the decertification motion. The court determined that " 'commonality' " was not the central issue; rather, "[t]he problem is the 'predominance' issue, as individual issues swamp the common issues."

As a threshold matter, the trial court ruled the "large number of new declarations" as well as "plaintiffs' efforts at a statistical analysis" constituted new evidence. And, in light of such new evidence, it determined "there [was] no good reason to ignore other evidence," and therefore it considered the entire record.

The trial court also expressed concern that plaintiffs' trial plan betrayed fatal flaws to continued class status. For one, the witness list fell far short of the "sample forecast by Steiner (either the forecast sample of about 1550, or those interviewed to date, about 218), suggesting that plaintiffs expect[ed] to rely on case-specific hearsay from the sample." Moreover, the court noted that plaintiffs did "not refer to a trial plan in their Opposition," and, although plaintiff's latest trial plan referenced a survey, "the record [did] not show the survey is, or will be, reliable and admissible. It show[ed] the opposite." Indeed, the court found the Steiner survey to be

10

unreliable and further determined the final survey planned for trial "[would] not be reliable."

The trial court provided a thorough discussion of the Steiner survey's flaws, sometimes citing the Boedeker declaration. First, the trial court explained the preliminary survey "actually look[ed] like an attempt at a full study which failed because of the very low response rate," and it noted that "Steiner [did] not tell us how she [would] re-do the study" or even "what issues need[ed] to be addressed." The court reiterated its concern that plaintiffs failed to address how they would admit "non-hearsay evidence of the participants' survey answers," concluding "there [did not] seem to be a way of handling the hearsay problem without calling the participants at trial – that is, at least many hundreds of witnesses, quite aside from witnesses the defense may wish to call."

Second, the trial court determined there was "no evidence" the survey's participants were randomly selected, "no discussion" of selection bias, "no analysis of nonresponse error," "no discussion of the effect of offering participants money," and "no discussion or adoption of any specific margin of error." Relatedly, the trial court faulted Steiner for failing to account for variability in the class. In sum, the court stated, "[t]he Steiner declaration seem[ed] unaware of basic statistical rules and concepts."[6]

---

[6] Beyond methodological flaws, the trial court observed other areas where the survey came up short. For example, the survey — and plaintiffs' opposition — made, but did not explain, the distinction between former and current employees. "Nothing seem[ed] to address" Dignity's payment of premium pay or how plaintiffs would identify which RNs who missed or interrupted breaks due to work duties were *also* not paid a premium. And the survey's wording was "peculiar"; distinguishing, for example, "work demands," "patient care," and "no one else available" among reasons to work through a break even though "these reasons might (for purposes of this suit)

Setting aside the Steiner survey's unreliability, the trial court described flaws permeating plaintiffs' class-wide proof. It found that the Vocera and Spectralink records failed as class-wide proof of the interruption theory for plaintiffs' rest break claim. In the court's view, the deposition testimony demonstrated there was no standard practice applied to the entire class, and the phone records were unreliable. The court also sided with Dignity that the claim was legally dubious because the DLSE opinion letters "show[ed] that, specifically in the health care industry, the carrying of the devices, alone, [did] not allow the inference that the employee [was] working."

The trial court held that plaintiffs failed to show they could provide class-wide proof of meal period violations at trial. It found the evidence demonstrated Dignity provided premium pay to RNs regardless of preapproval and therefore preapproval was "not mandated" to receive a premium. Accordingly, the court explained, "plaintiffs offer[ed] no way, short of calling the nurses to the witness stand, to determine if they put in for premium pay and if so, whether they got it." For the same reasons it discussed in refusing to admit the Steiner survey, the court rejected that plaintiffs' "percentage theory" evidenced a common practice that "affected 'all members of the class.' "

Indeed, even if there was a "pertinent cut-off" percentage that could establish class-wide liability, the trial court later expounded "that would not obviate defendants' right to call individual nurses to show they either did not interrupt or miss breaks for work related reasons or, if they did, that was or

be the same." And the court held the Steiner declaration was not properly certified under California law. Moreover, the court stated that survey failed to explain the import of its "percentage theory" of liability. For example, while Steiner purportedly found 88 percent of the class members suffered noncompliant breaks, neither she nor plaintiffs identified a percentage sufficient to prove the claim on a class-wide basis.

was not voluntary, or if not voluntary, they received premium pay for the missed break." So, while the *Donohue* presumption may apply class-wide, the court rejected plaintiffs' argument that "*only* a survey or other statistical analysis can rebut the presumption" and stated Dignity would be allowed to present "individualized rebuttals of the presumption."

Finally, the trial court determined that intra-class conflicts presented an independent basis for decertifying the class. It acknowledged a conflict does not arise "when a uniform policy or practice is merely put into effect by members of the class." But the court explained that was not the case here because plaintiffs were challenging "highly diverse," non-uniform practices that certain class members enforced against others.

The trial court granted the motion. Plaintiffs appealed.

## DISCUSSION

### I.     Legal Standards General Overview

Class actions are permitted "when the question is one of a common or general interest, of many persons, . . . and it is impracticable to bring them all before the court . . . ." (Code Civ. Proc., § 382.) Our Supreme Court has articulated that to proceed as a class action there must be "the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker, supra*, 53 Cal.4th at p. 1021.) " 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Ibid.*)

The inquiry into whether class members' common questions predominate over the questions affecting individual members — the thrust of

13

the instant trial court's decertification order — focuses on whether " 'the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1021.) "The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." (*Id.* at pp. 1021–1022.)

"[B]ecause group action . . . has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.) Thus, even after certifying a class, a trial court "retain[s] some flexibility" to decertify a class. (*Weinstat v. Dentsply Internat., Inc.* (2010) 180 Cal.App.4th 1213, 1226 (*Weinstat*).) But the "party moving for decertification generally has the burden to show that certification is no longer warranted." (*Kight v. CashCall, Inc.* (2014) 231 Cal.App.4th 112, 126.)

We review a decertification order for an abuse of discretion. (*Moen v. Regents of the University of California* (2018) 25 Cal.App.5th 845, 853.) "Unlike the general rule compelling a reviewing court to scrutinize the *result* below, not the trial court's rationale, we analyze the propriety of an order denying class certification based solely on the lower court's stated reason for the decision." (*Weinstat*, *supra*, 180 Cal.App.4th at pp. 1223–1224.) Decertification resting on an invalid reason, such as improper legal criteria or

14

an incorrect assumption, is an abuse of discretion. (*Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1361 (*Williams*).) Nevertheless, our review is circumscribed " ' "[b]ecause trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action." ' " (*Brinker, supra,* 53 Cal.4th at p. 1022.)

## II. The Trial Court Did Not Abuse Its Discretion by Considering the Motion Because RNs' Testimony Constituted New Evidence

Plaintiffs contend the trial court abused its discretion because Dignity did not meet the standard for decertification by presenting "new law or newly discovered evidence" showing changed circumstances. There is no merit to this contention.

While a class "can be decertified at any time, even during trial, should it later appear individual issues dominate the case," (*Macmanus v. A. E. Realty Partners* (1987) 195 Cal.App.3d 1106, 1117), decertification is appropriate " 'only where it is clear there exist changed circumstances making continued class action treatment improper.' " (*Green v. Obledo* (1981) 29 Cal.3d 126, 148.) "A motion for decertification is not an opportunity for a disgruntled class defendant to seek a do-over of its previously unsuccessful opposition to certification." (*Williams, supra,* 221 Cal.App.4th at p. 1360.) Thus, to balance the need for flexibility in the face of changed circumstances while curtailing abuse by class defendants, a class defendant seeking decertification is required to show new evidence or new law in support of its argument that continued class treatment is improper. (*Weinstat, supra,* 180 Cal.App.4th at p. 1226.) However, once this threshold showing is met, "the movant is not barred from also including evidence that might have been extant before, arguing that the new evidence, coupled with the existing

15

evidence, dictates a different result." (See *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1459.)

Here, the trial court expressly found there was new evidence, referencing "a large number of new declarations," plus "plaintiffs' efforts at a statistical analysis." Indeed, following certification, Dignity deposed 44 class members from the three hospitals at issue.

Plaintiffs do not dispute that these post-certification declarations shed light on RNs' varying experiences with respect to the practices at the three hospitals. Because plaintiffs' claims center on whether there were "uniform" practices in place at those hospitals, the RNs' testimony about their varying experiences reasonably constitutes "changed circumstances" regarding the propriety of continued class treatment. The trial court did not err in considering these declarations as new evidence reflecting changed circumstances.

Nonetheless, Plaintiffs allege such evidence is not "newly discovered" because "RNs are Dignity's own employees and Dignity could have used their testimony in its opposition to class certification, but chose not to." We disagree.

Our Supreme Court's decisions "clearly contemplate the possibility of successive motions concerning certification" based on evidence uncovered in post-certification discovery. (*Occidental Land, Inc. v. Superior Court* (1976) 18 Cal.3d 355, 360 (*Occidental*).) In *Occidental*, for instance, "During the months following the court's certification order, defendant conducted discovery proceedings in order to support a motion to decertify the action. It then filed its motion based on evidence not before the court in the prior proceeding." (*Ibid.*) Our high court was unbothered, stating, "This type of

16

procedure is authorized . . . ." (*Ibid.*)  Thus, in the context of decertification, "newly discovered" evidence is not limited to newly existing facts.[7]

Plaintiffs' authorities are unavailing.  *Williams* merely restates the well-established rule that "Decertification requires new law or newly discovered evidence showing changed circumstances." (*Williams, supra,* 221 Cal.App.4th at p. 1360.)  The federal trial court in *Otsuka v. Polo Ralph Lauren Corp.* (N.D. Cal., Jan. 25, 2010, No. C 07-02780 SI) 2010 U.S. Dist. Lexis 12867, at *15 did not deny decertification because the asserted new evidence was omitted from the defendant's opposition to class certification. Instead, the court explained the purported new facts did not show changed circumstances warranting decertification.  (*Ibid.* ["neither of these facts justifies decertification of the waiting time class" because the court "already rejected Polo's contention that variations in the specific amounts of class members' wait times defeats commonality"].)  In *Chavez v. Blue Sky Natural Beverage Co.* (N.D. Cal., Sept. 27, 2011, No. C 06-06609 JSW) 2011 U.S. Dist. Lexis 109738, at *25–28, the class defendant sought reconsideration based on "legal changes," but the federal trial court distinguished the "only new legal authority mentioned in the [decertification] motion."  In *Wood v. Marathon Refining Logistics Services LLC* (N.D. Cal., Oct. 28, 2024, No. 4:19-cv-04287-YGR) 2024 U.S. Dist. Lexis 216784, at *8, fn. 1, the federal trial court observed the purported " 'factual developments' " were merely case law, "the

---

[7] Allowing parties to develop facts regarding the propriety of class treatment by deposing additional witnesses post-certification does not denude trial courts of their ability to protect plaintiffs "against the abuse of a delayed motion to decertify by defendants." (*Green v. Obledo, supra*, 29 Cal.3d at p. 147.)  If a class defendant "hold[s] back his evidence and arguments on the issue," a court may hold that defendant "waived any right to move for decertification." (*Id.* at pp. 147–148.)

summary judgment order, and plaintiff's trial plan, but not any factual evidence."

*Weinstat*, too, did not involve factual evidence developed after the initial certification order. There, this court found that the trial court decertified a UCL claim and breach of warranty claim based on an incorrect interpretation of new case law. (*Weinstat*, *supra*, 180 Cal.App.4th at p. 1224.) Moreover, the purported changed law "only pertained to the UCL cause of action." (*Id.* at p. 1226.) In the context of the breach of warranty claim, we criticized the trial court for "in effect reassess[ing] the matter under existing law, coupled with newly packaged, but not newly discovered, evidence." (*Id.* at p. 1225.) That is not what the trial court did here.

In sum, the additional RN testimony constituted "newly discovered evidence" and therefore Dignity met its threshold burden to demonstrate changed circumstances. Accordingly, the court did not abuse its discretion by considering Dignity's motion.

## III. The Trial Court Did Not Abuse Its Discretion by Disregarding the Steiner Survey Evidence or Crediting Boedeker's Opinion in Determining Predominance

Plaintiffs argue the trial court exceeded its gatekeeping role with respect to expert evidence by disregarding the Steiner survey submitted in support of their opposition to Dignity's decertification motion. Plaintiffs further contend the court erred by relying on the Boedeker declaration and weighing the conflicting expert evidence. These arguments lack merit.

### A. Legal Standards

As mentioned *ante*, predominance concerns whether the preponderance of class members' common questions of law or fact (relative to individual members' individualized questions) renders " 'the maintenance of a class action . . . advantageous to the judicial process and to the litigants.' "

18

(*Brinker*, *supra*, 53 Cal.4th at p. 1021.) We review the trial court's predominance finding for substantial evidence. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 328 (*Sav-On*).) In doing so, we view the record in the light most favorable to the respondent and resolve all evidentiary conflicts and indulge all reasonable inferences in favor of the judgment. (*Williams-Sonoma Song-Beverly Act Cases* (2019) 40 Cal.App.5th 647, 650.)

Expert opinion based on relevant and reliable facts may constitute substantial evidence for the trial court's predominance determination. (*Apple Inc. v. Superior Court* (2018) 19 Cal.App.5th 1101, 1124 (*Apple*).) Where "expert opinion evidence provides the basis for a plaintiff's arguments regarding numerosity, ascertainability, commonality, or superiority (or a defendant's opposition thereto), a trial court must assess that evidence under *Sargon* [*Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770–772 (*Sargon*)]." (*Apple*, at p. 1120.) Under *Sargon*, "the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon*, at p. 772.) Accordingly, courts may exclude expert testimony on the grounds that there is no reasonable basis for the opinion, either because the type of information relied on is unsound or because the expert's reasoning is unsound. (*Ibid.*) We review the exclusion of expert testimony for abuse of discretion. (*Id.* at p. 773.)

Beyond resolving the admissibility of expert evidence, the trial court may " 'credit one party's evidence over the other's' " for purposes of discerning whether common or individual questions predominate. (*Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 981; *Utne v. Home Depot U.S.A., Inc.* (N.D. Cal., May 6, 2022, No. 16-cv-01854-RS) 2022 U.S. Dist. Lexis 82548, at

*6 (*Utne*) ["For the motion to decertify the class, the Court may discount or assign low weight to Crandall's opinion as it relates to these aspects of the motion"].) In doing so, a trial court does not rule on the merits of the case; it merely decides whether class certification is appropriate based on the competing evidence. (*Sav-On, supra*, 34 Cal.4th at p. 331 [affirming class certification after trial court credited plaintiffs' disputed evidence and it might have affirmed a denial of certification "if [the trial court] had credited defendant's evidence instead"].)

Moreover, "a statistical plan for managing individual issues must be conducted with sufficient rigor." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 31 (*Duran I*).) In *Duran I*, our high court stressed, "If statistical evidence will comprise part of the proof on class action claims, the court should consider *at the certification stage* whether a trial plan has been developed to address its use." (*Ibid.*) It expounded: "Rather than accepting assurances that a statistical plan will eventually be developed, trial courts would be well advised to obtain such a plan before deciding to certify a class action. In any event, decertification must be ordered whenever a trial plan proves unworkable." (*Id.* at p. 32.)

### B.    Analysis

The foregoing precedent belies plaintiffs' contention that "any findings that Ms. Steiner's methodology, assumptions or results might be unreliable, should go to the merits of the case."[8] The trial court could not consider

---

[8] Plaintiffs' authorities affirm a trial court must determine whether an expert opinion submitted in support of class certification is reliable. (*Apple, supra,* 19 Cal.App.5th at p. 1119 ["We see no reason why *Sargon* should not apply equally in the context of class certification motions"]; *Pecover v. Elec. Arts Inc.* (N.D. Cal., Dec. 21, 2010, No. C 08-2820 VRW) 2010 U.S. Dist. Lexis 140632, at *11 ["The court's task 'is to analyze not what the experts say, but

evidence so unreliable as to be inadmissible (*Apple*, *supra*, 19 Cal.App.5th at p. 1106), it could weigh conflicting expert opinions in assessing predominance (*Sav-On*, *supra*, 34 Cal.4th at p. 331),[9] and it properly considered whether plaintiffs' trial plan addressed the survey's admissibility at trial. (*Duran I*, *supra*, 59 Cal.4th at pp. 31–32.)

*Duran v. U.S. Bank National Assn.* (2018) 19 Cal.App.5th 630, 650 (*Duran II*) supports our conclusion. There, the plaintiffs' survey expert reported a 54 percent response rate from the 160 class members who were randomly selected to take the survey and then estimated confidence intervals and margins of error for certain sample sizes. (*Id.* at p. 640.) The defendant's rebuttal expert disputed the purported margins of error, opining that " 'far larger sample sizes than those proposed would be required.' " (*Ibid.*) He also opined that the challenged survey "was 'a textbook example of self-selection bias' because it [was] based on a self-selected sample of respondents." (*Ibid.*) The rebuttal expert also noted a "significant difference" between responses "from the same population" to the challenged survey and an earlier survey. (*Ibid.*)

---

what basis they have for saying it' "]; *Medlock v. Taco Bell Corp.* (E.D. Cal., Dec. 9, 2015, No. 1:07-cv-01314-SAB) 2015 U.S. Dist. Lexis 165235, *5 [assessing admissibility of expert testimony at the class certification stage and analyzing whether survey was " 'conducted according to accepted principles' " and " 'relevant' " to the issues in the case].)

[9] Plaintiffs' footnote complaining that "Dignity first introduced Boedeker's declaration in its decertification *reply* brief, giving Allison or her expert *no opportunity* to rebut Boedeker's criticism of Allison's survey" is not well-taken. Not merely because we may disregard points raised in a footnote (*People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5), but because plaintiffs did not present the survey until their *opposition* brief to Dignity's decertification motion.

On remand from *Duran I*, the trial court found the rebuttal opinion convincing. (*Duran II, supra,* 19 Cal.App.5th at p. 642.) In particular, it found the "discrepancy [between the surveys' responses] to be 'tangible evidence' supporting [the rebuttal expert's] arguments regarding self-interest bias." (*Ibid.*) Our Division One colleagues affirmed, stating, "the court did not abuse its discretion in ruling that the 2015 Survey [was] unreliable for the purpose of showing that common issues would predominate at trial." (*Id.* at p. 643.) "Accordingly, substantial evidence support[ed] the court's finding that the survey data was unreliable as evidence of uniformity . . ., and unreliable as statistical support for selecting a representative witness group to testify as to liability . . . without causing the inquiry to devolve into a multiplicity of individual mini trials . . . ." (*Id.* at p. 650.) So too here.[10]

The trial court did not abuse its discretion in ruling the Steiner survey was unreliable because substantial evidence, including the Boedeker declaration, supports its finding that "[t]here is no evidence the actual participants were randomly picked." Steiner stated she randomly selected 1,500 RNs yet *admitted* that only 218 RNs responded. This presents the

---

[10] There is no evidence that the trial court relied on the portions of the Boedeker declaration that plaintiffs characterize as a "credibility attack" on the Steiner survey. Instead, the court cited Boedeker's criticism of Steiner's *methodology*. The authorities plaintiffs cite in support of the proposition that "credibility attacks . . . invade the province of the fact-finder" are inapposite. (*Clicks Billiards, Inc. v. Sixshooters, Inc.* (9th Cir. 2001) 251 F.3d 1252, 1263 ["the district court did not exclude the survey on the ground that it was irrelevant or that it was undermined by some other fatal flaw"]; *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1182–1183 [expert invades province of jury by opining on an ultimate issue of law]; *Mukhtar v. Cal State Univ.* (9th Cir. 2002) 299 F.3d 1053, 1065, fn. 10 ["an expert witness cannot give an opinion as to her *legal conclusion*"], overruled on other grounds by *United States v. Bacon* (9th Cir. 2020) 979 F.3d 766, 770; *In re Scott* (2003) 29 Cal.4th 783, 823 [referee, not the expert, decides whether evidence underlying opinion is reliable].)

potential for nonresponse bias, confounding randomization. (*Duran I*, *supra*, 59 Cal.4th at p. 43 ["the sample will not reflect the characteristics of members of the population who chose not to respond to the survey"].) Nonresponse bias is potentially compounded by further selection bias stemming from Steiner's use of monetary incentives to participants. As the trial court observed, there was "no discussion of the impact that self-selection has on randomness," and plaintiffs fail to address that concern on appeal. (See *Duran II*, *supra*, 19 Cal.App.5th at p. 642; see also *McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 453 [faulting survey's "analysis of nonresponse bias" for failing to "consider whether any class members may have declined to participate due to their personal lack of any claim"].)

Plaintiffs are correct that an expert report need not be finalized at the certification stage. (*Stewart v. Quest Diagnostics Clinical Laboratories, Inc.* (S.D. Cal., Oct. 5, 2022, No. 3:19-cv-02043-RBM-KSC) 2022 U.S. Dist. Lexis 182891, at *30 [stating federal district courts "have denied motions to strike at the class certification stage, even where the survey had not yet been completed, *where the expert's testimony was otherwise reliable . . . .*" (italics added)].) But here the court found, for good reason, that the survey was not, and would not, be reliable even when finalized. The survey's low response rate was ostensibly why it was still "in the field." But, as the trial court stated, Steiner failed to explain "how she [would] re-do the study to get whatever sample size she [thought was] suitable."

The trial court was right to be skeptical whether Steiner *could* identify an appropriate sample size because Steiner did not "say anything about variability [among participants' answers] based on the pilot." (*Duran I*, *supra*, 59 Cal.4th at p. 42 ["It is impossible to determine an appropriate sample size without first learning about the variability in the population"].)

Relatedly, because the final survey's sample size was in a state of flux, Steiner merely expressed a "desired" confidence level of 95 percent and did not adopt a specific margin of error. (*Ibid.* ["the court must determine that a chosen sample size is statistically appropriate and capable of producing valid results within a reasonable margin of error"].) Plaintiffs are incorrect in their repeated assertion that the "survey was conducted from a random sample of RNs with a 5% margin of error and a 95% confidence factor."

We therefore agree with the trial court that "the problems associated with the current results really [were] probative of the utility of a final survey to be run" and also agree that the aforementioned problems were fatal to the use of statistical evidence as part of plaintiffs' trial plan.

Plaintiffs' reliance on *Utne* is misplaced. *Utne* involved an unpaid wage claim on a theory that "workers were under Home Depot's control from their walk from the front of the store to the break room in the back." (*Utne, supra,* 2022 U.S. Dist. 82548 at *15.) Following the close of discovery, the class defendant, Home Depot, filed a motion to decertify the class based, in part, on an expert report; the plaintiff moved to exclude the report. (*Id.* at *1–3.) The report used "video observation" as the basis for its opinion "on the percentages of employees engaged in personal activities on their pre-shift walk to the back of the store . . . ." (*Id.* at *6.) The court granted the motion to exclude insofar as it related to that specific opinion. (*Ibid.*) As the court explained, the expert had categorized a broad swathe of workers' observed activity as "personal activity," including "talking to colleagues and using personal cellphones." (*Ibid.*) This leap of logic was too far for the court, which concluded the expert could not "know whether an employee was engaged in work activity or not based solely on the video observation conducted" because a conversation with a colleague or on a cellphone "could

24

have concerned work issues." (*Id.* at \*7.) Thus, the opinion was inadmissible "for the purpose of the motion for class decertification."[11] (*Id.* at \*6, fn. 4; cf. *Sargon*, *supra*, 55 Cal.4th at p. 772 [court must determine whether an "opinion is based on a leap of logic or conjecture"].)

The extent to which the *Utne* court denied the plaintiffs' motion to exclude does not help plaintiffs. The court found that other concerns about the expert report — such as the "failure to provide margins of error" and deviation from "best practices for observational studies" — went "to weight, not admissibility, especially when considering that the instant motion concerns consideration of [expert's] opinions by the Court for the motion for class decertification, rather than what opinions will be presented to a jury." (*Utne*, *supra*, 2022 U.S. Dist. Lexis 82548 at \*5–6.) So, while the court found the remaining opinion admissible, it also ruled it could "discount or assign low weight to [the] opinion as it relates to" the decertification motion. (*Id.* at \*6.)

In sum, the trial court did not err in ruling that the Steiner survey was unreliable for class certification purposes and unworkable as part of the trial plan. Nor was there any error to the extent it accepted Boedeker's opinion and discounted the Steiner survey in making that determination.

## IV. The Trial Court Did Not Err in Finding Evidence In Support of Dignity's Affirmative Defense Created Individualized Issues

Plaintiffs argue the trial court erred in allowing Dignity to defeat predominance for the meal period claim by offering anecdotal evidence in

---

[11] Indeed, in separately ruling on the decertification motion, the court restated this opinion was "not helpful . . . because there [was] insufficient data underlying [the expert's] classification of which activities constitute personal activities." (*Utne*, *supra*, 2022 U.S. Dist. Lexis 82548 at \*16–17.)

25

support of an affirmative defense to its presumed class-wide liability under *Donohue*. We again disagree.

## A. Applicable Law

In *Donohue*, the Supreme Court held that a rebuttable presumption of liability arises when an employer's time records show employees suffered noncompliant meal periods. (*Donohue, supra*, 11 Cal.5th at pp. 75–78.) However, an " 'employer is not obligated to police meal breaks and ensure no work thereafter is performed.' " (*Id.* at p. 67.) Thus, "[a]n employer's assertion that it did relieve the employee of duty, but the employee waived the opportunity to have a work-free break, . . . is an affirmative defense" to the rebuttable presumption. (*Brinker, supra*, 53 Cal.4th at p. 1053 (conc. opn. of Werdegar J.); see *Donohue*, at pp. 75–76.)

The rebuttable presumption was originally articulated in Justice Werdegar's concurring opinion in *Brinker*, which *Donohue* adopted "in full." (*Donohue, supra*, 11 Cal.5th at p. 75.) In doing so, Justice Werdegar addressed how a defendant's affirmative defense of employees' waiver may impact class certification. (*Brinker, supra*, 53 Cal.4th at p. 1052 (conc. opn. of Werdegar J.).) She rejected that merely "the question why a meal period was missed renders meal period claims *categorically* uncertifiable." (*Ibid.*) She instead proposed a flexible standard, stating that "whether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues," leaving the question "for the trial court to decide on remand, in the fullness of its discretion." (*Id.* at pp. 1054–1055.)

As the high court subsequently explained in *Donohue*, although "the presumption goes to the question of liability," it does not "result in 'automatic liability' for employers." (*Donohue, supra*, 11 Cal.5th at pp. 76–77.) Instead,

26

"Employers can rebut the presumption by presenting evidence that employees were compensated for noncompliant meal periods or that they had in fact been provided compliant meal periods during which they chose to work." (*Id.* at p. 77.) It continued: " 'Representative testimony, surveys, and statistical analysis,' along with other types of evidence, 'are available as tools to render manageable determinations of the extent of liability.' " (*Ibid.*)

Post-*Donohue* cases affirm that, after a plaintiff establishes the presumption of class-wide liability, the trial court "must resolve whether the [defendant's] affirmative defense is susceptible to common, classwide proof and if that proof predominates over individual issues." (*Santillan v. Verizon Connect, Inc.* (S.D. Cal., June 13, 2022) 2022 U.S. Dist. Lexis 182405, at *38 (*Santillan*).)

*Estrada v. Royalty Carpet Mills, Inc.* (2022) 76 Cal.App.5th 685, 725 (*Estrada I*) is instructive. At issue, in part, was the decertification of a meal period subclass.[12] (See *id.* at pp. 709–714, 719–727.) The trial court had decertified the subclass because, based on "the conflicting testimony of five employees, from a class of 215 employees," it found that "employee choice led to a significant amount of late or missed meal breaks." (*Id.* at pp. 724–725.) The appellate court did not hold the trial court's conclusion to be reversible error; rather, the appellate court found that the trial court failed to apply *Donohue*'s burden-shifting framework. (*Id.* at pp. 722–724.) The appellate court therefore was "not reasonably certain" that the trial court would have reached the same conclusion if it had presumed the defendant's liability and

---

[12] The appeal also concerned a PAGA claim. (*Estrada I*, *supra*, 76 Cal.App.5th at p. 697.) The Supreme Court later took up "whether trial courts have inherent authority to strike a PAGA claim on manageability grounds." (*Estrada v. Royalty Carpet Mills, Inc.* (2024) 15 Cal.5th 582, 596 (*Estrada II*).) Thus, the high court left undisturbed the Fourth District's ruling regarding the non-PAGA meal period claim.

placed the burden on defendant "to show individual issues predominated." (*Id.* at pp. 723–725.) Nonetheless, on remand the trial court retained its discretion to determine the appropriate method to adjudicate the defendant's affirmative defense based on the evidence adduced in support of the defense. (*Id.* at p. 731.)

### B. Analysis

Here, like the defendant in *Estrada I*, Dignity pleaded employee choice to waive full, valid meal periods as an affirmative defense. Based on that defense, it introduced evidence seeking to rebut the presumption established by *Donahue*.

Unlike the trial court in *Estrada* I, however, the trial court here did not disregard the *Donohue* presumption before turning to whether Dignity's affirmative defense was susceptible to common, class-wide proof. Thus, the trial court did not apply improper legal criteria or make erroneous legal assumptions in evaluating the appropriate method to adjudicate Dignity's affirmative defense based on the evidence it submitted. The dispositive issue is whether substantial evidence supports the trial court's ruling that adjudication of Dignity's affirmative defense creates too many individualized inquiries to support class treatment. (*Sav-On*, *supra*, 34 Cal.4th at pp. 326–327.) We find it does.

Dignity submitted RNs' deposition testimony reflecting idiosyncratic reasons for noncompliant meal periods. For example, many class members testified that they "preferred" to take their first meal break after the fifth hour because they got hungry later, or in circumstances when they had "a little break prior to clocking out for lunch," or because it made "the shift go by faster." Such testimony constitutes substantial evidence in support of the trial court's finding that Dignity had "defenses that apply to some but not all

28

nurses." (*Sav-On*, *supra*, 34 Cal.4th at p. 329 [record containing "documents, depositions, declarations, and interrogatory responses" comprised "substantial, if disputed, evidence" on issue of predominance]; cf. *Brinker*, *supra*, 53 Cal.4th at p. 1052 [no common proof of employer's knowledge of off-the-clock work existed "in the absence of evidence of a uniform policy or practice"].) This evidence was sufficient to defeat class treatment by demonstrating that individual issues predominated the issue of liability.

Plaintiffs' arguments do not demonstrate the trial court abused its discretion.

As an initial matter, plaintiffs misconstrue the trial court's rationale for decertifying the meal period subclass. The court did not "negat[e] the class liability presumption" because class members' "harm was not uniform." The issue as framed by the court was whether Dignity, which indisputably bore the burden of rebutting the presumption of liability, adduced substantial evidence in support of its defense that gave rise to unmanageable, or the predominance of, individualized inquiries. (See *Estrada I*, *supra*, 76 Cal.App.5th at pp. 723–724 [because defendant bears burden to prove its affirmative defense, "[i]t then follows that the burden [is] on [defendant], not plaintiffs, to show individual issues predominated"].) The court found it did. Plaintiffs' statement that "Dignity was not able to rebut the presumption" is a red herring.

Plaintiffs fault Dignity for failing to "keep contemporaneous records of reasons *why* a meal break could show as missed, late, or short in employee time records." But this does not help their argument. If such records existed, then the viability of Dignity's affirmative defense may have been subject to class wide resolution. Since such records do not exist, Dignity's affirmative defense turned on RNs' testimony.

None of plaintiffs' authorities bar the use of anecdotal testimony to rebut the presumption of liability. Indeed, plaintiffs' authorities tacitly endorse the position that such evidence may be used in rebuttal. (E.g., *Morgan v. ROHR, Inc.* (S.D. Cal., Dec. 20, 2023, No. 20-cv-574-GPC-AHG) 2023 U.S. Dist. Lexis 226952, at *18 ["whether a missing second meal period was voluntarily waived or improperly denied by management will require individual inquiry" because "Employee declarations and depositions demonstrate that some employees . . . routinely waived their second meal period so that they 'could go home earlier' "].) Thus, Dignity's ability to rebut the presumption of class liability was not, as plaintiffs suggest, limited to "showing on a <u>class</u> basis that RNs *chose* not to take breaks."[13]

Nor, as plaintiffs contend, did the trial court hold that Dignity was entitled to "unlimited" testimony to rebut liability as to each class member. Instead, it merely quoted *Duran I*, *supra*, 59 Cal.4th at page 40 in stating that " 'any class action trial plan, including those involving statistical methods of proof, must allow the defendant to litigate its affirmative defenses.' " Our high court has clarified that *Duran I* did not articulate a "right to present the testimony of an unlimited number of individual employees in support of such affirmative defense." (*Estrada II*, *supra*, 15 Cal.5th at p. 616.) But it affirmed that "courts may exercise discretion

---

[13] Their contention to the contrary exposes a misreading of the Supreme Court's references to " '[r]epresentative testimony, surveys, and statistical analysis.' " (*Donohue*, *supra*, 11 Cal. 5th at p. 77, quoting *Brinker*, *supra*, 53 Cal.4th at p. 1054.) First, the court's reference to representative evidence was directed to manageability determinations of the *extent* of liability, not to an employer's rebuttal of the *fact* of (presumed) liability. (See also *Estrada II*, *supra*, 15 Cal.5th at p. 616 ["defendant is permitted 'to introduce its own evidence, both to challenge the plaintiffs' showing and to reduce overall damages' "].) Second, and more importantly, *Donohue*'s language is inclusive of "other types of evidence."

regarding how to adjudicate such defenses, so long as the defendant is permitted 'to introduce its own evidence, . . . to challenge the plaintiffs' showing . . . .' " (*Ibid.*)  In *Estrada II*, the Supreme Court pointedly did not weigh in on the Court of Appeal's statement in *Estrada I* "that the trial court had discretion whether to allow 'additional witnesses or other evidence' on remand." (*Estrada II*, at p. 617, fn. 33, quoting *Estrada I*, *supra*, 76 Cal.App.5th at p. 731.)

*Santillan* does not lend succor to plaintiffs' argument either.  There, the court carefully evaluated whether individualized issues would arise from the evidence that Verizon submitted in support of its affirmative defense that class members voluntarily worked during meal period.  (*Santillan*, *supra*, 2022 U.S. Dist. Lexis 182405 at *38–41.)  In analyzing class declarants' statements, the court observed that "None indicated that they ever voluntarily work through lunch," and therefore the declarations did "not go to Verizon's affirmative defense of voluntary waiver." (*Id.* at *39.)  The plaintiff, however, admitted he " 'preferred' " to occasionally work through his lunch break; but he also "testified that he reduced or missed his meal period because of his perception about his work duties." (*Id.* at *40.)  The former statement constituted "Verizon's only evidence that the affirmative defense requires an individualized inquiry," but the latter statement undermined a "voluntary waiver" defense because the plaintiff "considered there to be negative consequences for his employment if he failed to perform unpaid work during his meal periods." (*Id.* at *40–41)  The remaining evidence in support of Verizon's defense — i.e., Verizon's meal period policies and timekeeping procedures — were common to all class members.  (*Id.* at *38–39.)  Thus, the court held "[t]he viability of Verizon's affirmative defense

[was] subject to classwide resolution." (*Id.* at \*41.) The evidence at issue in the instant case stands in contrast to that in *Santillan*.

Moreover, the trial court determined the meal period claim was particularly impacted by the unreliability of the Steiner survey as common proof and the unworkability of the trial plan, as discussed *ante*. The court reiterated the Steiner survey was "not useful." Relatedly, it observed the trial plan "suggest[ed] 20-30 nurses" would testify "on this issue," which would likely prove too few to admit non-hearsay evidence of participants' survey answers. (*People v. Sanchez* (2016) 63 Cal.4th 665, 686 ["When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay"].)

It is circumstances like this where we must be mindful that "trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action." (*Brinker*, *supra*, 53 Cal.4th at p. 1022; see also *Williams-Sonoma Song-Beverly Act Cases*, *supra*, 40 Cal.App.5th at p. 656 [" '[w]here a certification order turns on inferences to be drawn from the facts, " 'the reviewing court has no authority to substitute its decision for that of the trial court' " ' "].) Accordingly, we hold the court did not abuse its discretion in concluding that individualized inquiries predominated Dignity's showing to rebut its presumed liability and that the issue was otherwise not manageable on a class basis.

## V. The Order Decertifying the Rest Break Subclass Relied on a Valid Independent Rationale Supported by Substantial Evidence

In decertifying the rest break subclass, plaintiffs contend the trial court failed to apply the correct legal criteria and therefore made an improper merits ruling. Specifically, plaintiffs contend the Supreme Court's decision in

*Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 270, held that an employer violates their obligation to provide 10-minute rest breaks every four hours to non-exempt employees if the breaks are interruptible, and they further contend this holding abrogates any DLSE opinion letters that hold otherwise for healthcare employees. Even if we assume plaintiffs are correct on these points, they have not carried their burden of demonstrating error.

We must analyze the propriety of the *reasons* stated in the trial court's decertification order, ignoring other grounds which might support denial. (*Weinstat, supra*, 180 Cal.App.4th at pp. 1223–1224.) But, as this Court has also stated, " 'Any valid pertinent reason stated will be sufficient to uphold the order.' " (*Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1447 [affirming order denying certification], quoting *Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at pp. 435–436 [reversing order denying class certification only after evaluating and rejecting both reasons stated by the trial court].) Other courts have also stated that a reviewing court will affirm an order if the trial court independently relied on any valid basis. (E.g., *Peviani v. Arbors at California Oaks Property Owner, LLC* (2021) 62 Cal.App.5th 874, 887 [" 'We will affirm an order denying class certification if any of the trial court's stated reasons was valid and sufficient to justify the order' "]; *Ramirez v. Balboa Thrift & Loan* (2013) 215 Cal.App.4th 765, 777 ["if a trial court bases its denial of class certification on an incorrect legal analysis, a reviewing court must reverse and remand, unless the trial court independently relied on at least one other legally valid and factually supported ground"]; *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 844 ["We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order"].)

The trial court explained that plaintiffs' rest break claim was grounded in a theory that "because some nurses carried work-related phones, they were on call, negating the break period." Because it was "undisputed that the defendant's policy was that these be turned off while on break," plaintiffs "need[ed] to establish a practice." The trial court highlighted the deficiencies in plaintiffs' attempt to evidence such a uniform practice. RNs' testimony presented one problem. Of the many RNs who carried their work-issued phones while on break, testimony and declarations revealed that "some thought they had to (favoring plaintiffs' position in some respects) and some did not (favoring the defense)."

The trial court expressed more concern, however, with the phone records' reliability as common proof. It noted that some RNs testified to a practice of handing off their phone to a break nurse *without logging out*. It then observed that expert analysis of Dignity's records, which revealed that "about 12.6% of the time" a call was logged when it was "clear the nurse at issue wasn't at work at all. Indeed, over 20% of class representative Allison's putative calls were while she was not working at all." Moreover, as the trial court also stated, "There's no data showing who used Spectralink phones," a fact plaintiffs admit. Considering "Plaintiff [did not] otherwise disagree with the defense position on the inadequacy of [the Vocera and Spectralink] records," the court concluded "there [was] no evidence from phone records showing a practice that nurses were on call during breaks."

Substantial evidence supports the trial court's conclusion. The court was therefore within its discretion in finding that plaintiffs' theory of liability was not susceptible of common proof at trial. (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 997 ["In light of Sears's substantial evidence disputing the uniform application of its business policies and practices, and

showing a wide variation in proposed class members' job duties, the trial court was acting within its discretion in finding that plaintiff's theory of Sears's liability was not susceptible of common proof at trial"].)

In their reply brief, plaintiffs contend Dignity misrepresented the record because the initial certification order was based on updated expert analysis that excluded the 12.6 percent of calls where an RN was logged into the receiving Vocera device yet never clocked in at work. Plaintiffs miss the point. The data revealed that a significant percentage of RNs remain logged in to a Vocera device even on days they do not work at all; plaintiffs do not dispute this. Such data calls into question a fortiori whether and how often RNs remain logged in to a Vocera device when they handed off their device for a 15-minute break.

Plaintiffs did not address or otherwise challenge the primary basis for the trial court's order decertifying the rest break subclass. Instead, they based their argument on the last sentence in the order's discussion of the rest-based claims. There, the court stated: "Even if it were true that there was a policy or practice of carrying phones while on breaks—and plaintiffs don't show how they will establish that—the DSL opinion letters offered by the defense [citation] show that, specifically in the health care industry, the carrying of the devices, alone, does not allow the inference that the employee is working." Facially and logically, this was an independent reason for its decision.

Plaintiffs' failure to address the primary basis for the trial court's decision is fatal to their challenge. (*Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 653 ["An appellant abandons an issue by failing to raise it in the opening brief"].) Since plaintiffs fail to challenge an independent and valid basis for the trial court's ruling, we uphold the decertification order. (See *Quacchia v.*

*DaimlerChrysler Corp.*, *supra*, 122 Cal.App.4th at p. 1447; *Peviani v. Arbors at California Oaks Property Owner, LLC*, *supra*, 62 Cal.App.5th at p. 887; *Ramirez v. Balboa Thrift & Loan*, *supra*, 215 Cal.App.4th at p. 777.)[14]

\* \* \*

We need not reach any remaining issues, such as whether the trial court's finding that intra-class conflict supports decertification of the class or whether plaintiffs' failure to challenge that decision in their opening brief constitutes forfeiture. (See *Kight v. CashCall*, *supra*, 231 Cal.App.4th at p. 128 [predominance sufficient ground for decertification].)

## DISPOSITION

The order is affirmed. Dignity is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

_____
Simonds, J.*

WE CONCUR:

_____
Brown, P. J.

_____
Goldman, J.

---

[14] Dignity's requests for judicial notice of DLSE opinion letters are therefore denied as immaterial to our analysis. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6, [declining to take judicial notice of materials not "necessary, helpful, or relevant"].)

\* Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/24/25

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOANNE ALLISON et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>DIGNITY HEALTH,<br><br>    Defendant and Respondent. | A169225<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT]<br><br>(City and County of San Francisco<br>    Super. Ct. No. CGC18566922) |

BY THE COURT:*

The opinion in the above-entitled matter filed on June 2, 2025, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in judgment.

Date: _____          _____
                                                                Presiding Justice

---

* Brown, P.J., Simonds, J.**, and Goldman, J.

** Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1

***Allison v. Dignity Health*** **(A169225)**

Trial Court:       City and County of San Francisco

Trial Judge:      Hon. Curtis E.A. Karnow


Attorneys:

Markham Law, David Roger Markham, Lisa Rose Brevard; Cohelan Khoury & Singer, Isam Charles Khoury, Michael D. Singer, Maggie K. Realin; United Employees Law Group, Walter Lewis Haines, for Plaintiff and Appellant.

Sheppard, Mullin, Richter and Hampton, Richard Jay Simmons, Jason Wade Kearnaghan, Hilary Ann Habib, Bryanne Johne Lewis, for Defendant and Respondent.